1

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   AARON MICHAEL AGUILERA,                 Case No.  1:22-cv-0201-DC-JDP (P)

12                 Petitioner,

13        v.                                 FINDINGS AND RECOMMENDATIONS

14   ROBERT BURTON,

15                 Respondent.

16

17        Aaron Michael Aguilera ("petitioner") seeks a writ of habeas corpus under 28 U.S.C.

18   § 2254.  ECF No. 1.  He was convicted of: two counts of premeditated murder, shooting at an

19   inhabited dwelling, and murder special circumstances.  Petitioner argues that he is entitled to

20   habeas relief because: (1) the trial court erroneously instructed the jury not to accept his

21   uncorroborated testimony as proof of any fact; (2) the trial court erroneously admitted hearsay

22   evidence from a gang expert; and (3) cumulative error deprived petitioner of a fair trial.

23   Respondent has filed an answer, ECF No. 12, and petitioner has filed a traverse, ECF No. 15.  For

24   the reasons stated hereafter, the petition should be denied.

25

26

27

28

# Background

I have reviewed the background summary articulated by the state appellate court on direct appeal. It is correct, and I reproduce a portion of it here for factual context:

> E.R. first became familiar with the term "Norteño" as a child living in Modesto. He learned Norteños claim the color red and number 14; their enemies are law enforcement and Southerners or Sureños; and Southerners claim the color blue and number 13.
>
> E.R. first became a Norteño gang member when he was 17 years old. He started dealing drugs to other drug dealers when he was 17 or 18 years old. He regularly armed himself with a handgun, and sometimes participated with his friends in shootings. By the time he was 19, E.R. was a member of Westside Boyz, a Norteño gang, and was making a living by selling drugs. He served time in the county jail. When he got out, he gave money to older Norteños who had been in the jail with him, in order to help them out and as a sign of respect.
>
> E.R. wanted to elevate his status within the Norteño gang, so he made himself available for whatever was needed at a particular time. This included sometimes committing acts of violence against rivals. Although he was never directly told to do something, whatever needed to be done would be brought up in conversation with other Norteños, and it would get done. E.R. never said he did not want to do something; weakness was not an honored trait in the gang, and saying "no" to another gang member constituted weakness.
>
> E.R. considered himself an active Norteño gang member until 2007. During that time, he moved from selling heroin and cocaine to selling methamphetamine. He had other people selling drugs for him and was making thousands of dollars a week. Everyone involved in his operation was a Norteño gang member. E.R. did not view himself as generating money for the gang, but admitted to giving some money to the gang.
>
> E.R. went to jail multiple times. His gang status "on the streets" went into jail with him. When he went into jail, he had to make a written report to the Norteño in charge of the jail, giving a full briefing of everything he had been doing on the streets, including where he was operating and who was involved. This was required of him as a Norteño going into custody.
>
> Even on the streets, the Norteño gang had a rank structure. There was always someone who was in charge. Everyone had to report to someone so that any issue could be dealt with immediately. A 'shot caller' was the person who handed down the orders for whatever needed to be done, up to and including murder.
>
> E.R. was first sent to state prison, at Susanville, in around 2000. Once there, he reported to the Norteño in control of the area. In prison, E.R. chose to be educated by other prisoners in the history and ways of the Norteño gang. E.R. believed in the cause they fought

for, which was to look out for their people. He was willing to sell drugs, financially support other Norteños, and even kill for the cause. During this period of education, E.R. learned about penalties for Norteños who violated Norteño rules. There were escalating levels of discipline that depended on the violation. The ultimate discipline was murder.

While in prison at Susanville, E.R. participated in three riots, one of which involved weapons. His gang status increased. When he was paroled back to Stanislaus County, instead of setting up his own drug operation like before, he now did things in a lot more structured manner, including checking with the shot caller. E.R. acted as a wholesaler, purchasing pounds of methamphetamine from "Border Brothers" — people from Mexico who may have been part of a Mexican drug cartel — then splitting it with his partner and distributing it to gang members "[i]n the making" who sold it. E.R. had a following or "crew," i.e., individuals who were ready to do whatever he needed done.

E.R. first met Ramirez in around 2003 or 2004. Ramirez was influential within the gang, although at the time, E.R. did not consider him to be a shot caller. From E.R.'s perspective, they were equal in terms of their gang status.

At some point, E.R. received a three-year prison commitment and was sent to Jamestown. The people there were deemed "no good" in that they no longer followed Norteño guidelines or took orders from the gang. E.R. did not want to go to Jamestown, but once there, he chose to stay. In his mind, he was done with the Norteño gang. Once he stayed at Jamestown, he was labeled a dropout.

In 2006 or 2007, E.R. was paroled to Modesto, where he began a law-abiding life. That lasted a couple of years, then he returned to dealing drugs, albeit on a smaller scale than previously. Although a couple members of his crew claimed to be Norteños, E.R. no longer considered himself a Northerner. Because E.R. had been at Jamestown, he knew there would be problems on the streets, so he always carried a gun on his person as a precaution.

In 2009, C.M. was renting a unit in a duplex on Santa Barbara Street, on the east side of Modesto. Her three children sometimes lived there with her. Around February, E.R. and his 10-year-old son moved in with her. Although E.R. had stopped dealing drugs for a while, he started again when he moved in. He was a wholesaler of methamphetamine. Individuals who were part of E.R.'s crew also were involved.

E.R. sold drugs out of the garage on a daily basis. He knew his customers. On occasion, he sold to gang members. He considered his own gang status to be that of a dropout. By this time, E.R. did not feel he owed any allegiance to the Norteño gang. He was aware Norteños claimed the neighborhood, and that traditionally, Norteños expected people who sold drugs in their neighborhoods to pay taxes, i.e., a portion (customarily, 10 percent) of the proceeds. E.R. did not

want to pay taxes, however, and did not pay money from his drug dealing to Norteños.

Aguilera lived on La Loma, not far from E.R.'s house. From individuals in his crew, E.R. learned Aguilera was a Norteño gang member.

According to E.R., he first encountered Aguilera and Sifuentez on the night of June 16.8  That night, E.R. was at home with Jason C., nicknamed Tallcan; Jason R., nicknamed J-Rock (a gang dropout); and C.M. E.R. received a telephone call from Daniel G., who was one of his crew. Daniel was not a Norteño. Daniel said he was at Sifuentez's house and needed to be picked up. He said Sifuentez and Aguilera were drunk. He sounded scared, and did not mention a party. E.R. said he would be right there. He took a gun with him even though he did not expect trouble, because he always carried a gun.

Sifuentez lived on Covena Avenue, a few blocks from E.R. E.R. had been there before to see Sifuentez's sister, to whom he sold drugs. E.R. and C.M. drove to Sifuentez's house in C.M.'s Honda. Jason C., J-Rock, and a woman followed in a white Cadillac Escalade. E.R. was not looking for trouble, but he knew J-Rock was armed with a .45-caliber firearm.

E.R. pulled up in front of Sifuentez's house and called Daniel to say he was out front and to come on. Three individuals came outside. Aguilera approached the vehicle from the yard area. He came up to the passenger window, where C.M. was sitting, and appeared to be looking through the rolled-up, darkly tinted glass. Sifuentez was standing in the middle of the yard, somewhat behind Aguilera. The third individual, whom E.R. did not recognize, went around the front of the car. All three men walked up fast, like they were getting ready to do something.

E.R. jumped out of the car. He pointed his .357 at the third individual and told him to get back. He then turned the gun on Aguilera and told him to back away from the car. Sifuentez started firing. His first shot hit E.R.'s shirt, but not his body. E.R. returned fire as the three men ran back toward the house. J-Rock jumped out of the other vehicle and also started firing. When his gun was empty, E.R. got back in his car and drove home. Jason C. and J-Rock followed E.R. back to his house. Neither E.R. nor C.M. called the police. At the time, C.M.'s mindset was that members of law enforcement were not her friends.

E.R. had just purchased a number of security cameras, so he, Jason C., and J-Rock began putting them up. It was starting to get light by this point. E.R. saw Aguilera and Sifuentez pass the house two or three times in Aguilera's small white car. Aguilera was driving. On one of the passes, they stopped at a stop sign, turned around, waited a moment, and then accelerated. Sifuentez fired from the car. E.R., who had reloaded his .357 when he got home and was now standing by the side of his house, fired back. Afterward, he saw a number of bullet holes in the front door and other parts of the house.

4

1

2

3

After the shooting, E.R. did not call the police, as he thought he would deal with the situation himself. The police came that morning anyway. E.R. instructed C.M. to say nobody was there but her, and that she had heard shooting but it did not involve her. C.M. refused to allow the police into the house, and they left.

4

5

6

7

On June 19, police detained E.R. and C.M. and searched their house. They seized a sawed-off shotgun, a sawed-off .22-caliber rifle, a .357-caliber handgun, ammunition, security cameras, and four Stanislaus County sheriff's uniform shirts. E.R. was arrested for being a felon in possession of firearms. A few days later, police found methamphetamine and drug paraphernalia at the house. E.R. was arrested a second time. On each occasion, he posted bail.

8

9

Sometime after the incident on Covena, E.R. saw Ramirez in front of Aguilera's house. E.R. was going somewhere with C.M., and by the time he returned, Ramirez and Aguilera both were gone.

10

11

12

13

Another time, E.R. was dropping C.M. off at her job when he saw Ramirez driving down McHenry Avenue. E.R. got behind him in the Honda. He wanted to try to get Ramirez's attention and pull him over so they could discuss what was going on. He felt they could come to an understanding so things would settle down. With respect to Ramirez's gang status at that time, E.R. knew Ramirez "had the ability to shut all that down."

14

15

16

17

E.R. followed Ramirez down McHenry. E.R.'s car windows were down and his radio was playing loudly. Ramirez headed toward Aguilera's house. By the time they reached La Loma, E.R. knew Ramirez had seen him. Ramirez accelerated, and so did E.R. Ramirez ended up running a stoplight. E .R. let him go after that. They drove past Aguilera's house, but Aguilera's vehicle was not there and E.R. did not see anyone.

18

19

20

21

22

23

24

25

As of July 28, E.R. had made no attempt to rearm himself, and he no longer had a surveillance system at the house. That evening, there were seven or eight children, including E.R.'s 10-year-old son, inside the house, having a sleepover. The layout was such that the garage was attached to the front of the duplex, with the living room on the other side of the garage wall. Five adults—E.R., C.M., Jason C., Carlos R., and Erik O.—were in the garage. The garage door was up. There was a black netting-type shade hanging over the opening to keep out the bugs and sun. There was also a bamboo shade or screen that hung down, although C.M. did not believe it covered the whole garage. At night, it was possible to see out of the garage and identify someone approaching, even with the coverings hanging down. It was also possible for someone walking up the driveway at night to see inside the lighted garage.

26

27

E.R. was seated in his recliner with his back to the netting. Jason C. and Carlos were playing darts, with Jason C. standing by the door that went into the house. C.M. was facing E.R., and Erik was sitting across from E.R. on a couch that was in the garage.

28

According to C.M., she saw two males wearing white T-shirts quickly walk up between the two vehicles parked in the driveway. Sifuentez was the taller of the two; he was in the lead, and he put his face against the screen and stared into C.M.'s eyes. Aguilera was close behind and slightly to the side. Both were hunched over, because the garage door was not all the way up. T heir hands were behind their backs. One of them asked for E.R. C.M. responded by asking who wanted to know. They did not answer, then said E.R.'s name again. C.M. again asked, more loudly this time, who wanted to know. When there still was no response, she yelled, "Who the fuck wants to know?" She then heard gunfire from the front of the garage. She could not tell if there was one gun or two. Nobody inside the garage fired back. She saw four or five bullets strike Jason C. When the shots stopped, she went inside the house. She then heard a second series of shots.

According to E.R., his attention was caught by what sounded like a couple people walking up. When Carlos asked who they wanted, Aguilera, whose voice E.R. recognized, asked if E.R. was there. Carlos answered back, "Who is it," then gunshots rang out from behind E.R. It sounded like there were two guns. E.R. saw Jason C. get hit. E.R. started to get up and was shot in the hand. He yelled at C.M., "The kids," and he and she ran inside.

According to C.M., E.R. yelled at the children to get to the back of the house. E.R.'s 10-year-old son did not move, and C.M. saw that he had been shot in the back of the head. He was still alive and screamed that he wanted his daddy. C.M. held his hand and called 911. E.R. was kicking things in the house and screaming. As soon as C.M. picked up the phone to call 911, E.R. yelled at her not to say anything or cooperate. C.M. interpreted this as meaning not to say anything at all, that E.R. would take care of it. When the police arrived, C.M. did not cooperate with them. She blamed the police for leaving them no way to defend themselves. She did not tell the truth when first interviewed by the police, and even deliberately identified the wrong person in a photographic lineup. She believed E.R. would handle the situation "on the street," i.e., there would be retaliation.

According to E.R., he returned to the garage, unsuccessfully tried to lower the garage door, and then ran out the front door and down the walkway to the street. He saw two individuals running off to his right. He recognized one as Aguilera, as Aguilera turned around as he was running and looked back at the house. He was wearing dark clothing. E.R. could not tell if the other person, who did not turn around, was male or female.

E.R. came back inside the garage. Jason was on the floor, not moving. E.R. went into the house to make sure the children were all right. C.M. was screaming, and E.R. saw that his son had been shot.

E.R. then went next door, as Carlos had gone there after jumping the fence. E.R. knew C.M. was calling an ambulance, so he told Carlos to leave, because the cops were coming. Wayne W., a childhood

friend, walked up from a nearby apartment. E.R. also told him to leave.

When the police arrived, E.R. lied and told them he did not know who did the shooting. He was also aggressive toward them. Because he had never trusted the police, E.R. told C.M. not to talk to them when the police were questioning them at the hospital. He intended to take care of it himself. He felt law enforcement was partly responsible for what happened, because they made him vulnerable by taking his surveillance cameras and guns.

While briefly hospitalized, E.R. learned he had been indicted in federal court for possessing the sawed-off shotgun and other firearms found in his house. He was taken into custody.

In 2010, E.R. finally decided to cooperate regarding his son's death. At his request, his attorney contacted the prosecutor in this case and, on March 2, 2010, E.R. was interviewed by Stanislaus County Detective Owen with the prosecutor present. On June 3, 2010, E.R. entered into a plea agreement pursuant to which he was sent to federal prison for 10 years (about 86 months after good-time credits). Because he was testifying, there was no returning to the gang for him; from his knowledge of the ways of the Norteño gang, the penalty for testifying against gang members was death.

C.M. eventually decided to cooperate because she believed E.R.'s son and Jason C. deserved better. She went to school and earned several degrees. She feared retaliation for testifying, however, and in May 2012, she entered the Witness Protection Program. She was relocated out of the Modesto area and her rent had been paid by the program since approximately June 2012.

ECF No. 11-6 at 1050-58 (internal footnotes omitted).

## Discussion

## I.    Legal Standards

A federal court may grant habeas relief when a petitioner shows that his custody violates federal law. *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75 (2000). Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition. *See Harrington v. Richter*, 562 U.S. 86, 97 (2011). To decide a § 2254 petition, a federal court examines the decision of the last state court that issued a reasoned opinion on petitioner's habeas claims. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018); *Van Lynn v. Farmon*, 347 F.3d 735, 738 (9th Cir. 2003) ("Because, here, neither the court of appeal nor the California Supreme Court issued a reasoned opinion on

1     the merits of this claim, we look to the trial court's decision."); *McCormick v. Adams*, 621 F.3d

2     970, 975-76 (9th Cir. 2010) (reviewing the decision of the court of appeal, which was last

3     reasoned decision of a state court); *Gill v. Ayers*, 342 F.3d 911, 917 n.5 (9th Cir. 2003) ("Because

4     the California Supreme Court denied review of Gill's habeas petition without comment, we look

5     through the unexplained California Supreme Court decision to the last reasoned decision . . . as

6     the basis for the state court's judgment.") (internal quotations omitted).

7        Under AEDPA, a petitioner may obtain relief on federal habeas claims that have been

8     "adjudicated on the merits in state court proceedings" only if the state court's adjudication

9     resulted in a decision (1) "contrary to, or involved an unreasonable application of, clearly

10     established Federal law, as determined by the Supreme Court of the United States" or (2) "based

11     on an unreasonable determination of the facts in light of the evidence presented in the State court

12     proceeding."  28 U.S.C. § 2254(d).

13      **II.**      **Analysis**

14          **a. Instructional Error**

15        Petitioner argues that the trial court erred by instructing the jury not to accept his

16     uncorroborated testimony as proof of any fact   The state court of appeal rejected this claim:

17
18            Aguilera contends the trial court erred by instructing the jury, pursuant to a modified version of CALCRIM No. 301 (Single Witness's Testimony), that his testimony required supporting evidence to be considered as proof of any fact. Ramirez claims CALCRIM No. 301, combined with parts of CALCRIM No. 336 (In-Custody Informant), incorrectly required the jury to find corroboration for exculpatory evidence given by the informants and by Aguilera. Sifuentez joins both arguments.  The Attorney General concedes it was error to include Aguilera in CALCRIM No. 301, but argues the error was harmless and that CALCRIM No. 336 was properly given.  We agree with the Attorney General.

23            A. Background[1]

24
25            At the time of defendants' trial, the CALCRIM No. 301 pattern instruction read: "[Except for the testimony of ___ <insert witness's name>, which requires supporting evidence [if you decide (he/she) is an accomplice],] (the/The) testimony of only one witness can

26

27        [1] The brackets, angle brackets, and parentheses that follow, confusing though they may be,

28    are reproduced as they appear in the appellate court's decision.  Some quotation marks, however, have been omitted for clarity.

prove any fact.  Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence."

The CALCRIM No. 336 pattern instruction read:

> View the (statement/ [or] testimony) of an in-custody informant against the defendant with caution and close scrutiny.  In evaluating   such (a statement/ [or] testimony), you should consider the extent to which it may have been influenced by the receipt of, or expectation of, any benefits.  This does not mean that you may   arbitrarily   disregard   such   (statement/   [or] testimony), but you should give it the weight to which you find it to be entitled in the light of all the evidence in the case.

> <Give the following paragraph if the issue of whether a witness was an in-custody informant is in dispute>

> [An in-custody informant is someone[, other than (a/an) (codefendant[,]/   [or]   percipient   witness[,]/   [or] accomplice[,]/ [or] coconspirator,)] whose (statement/ [or] testimony) is based on [a] statement[s] the defendant allegedly made while both the defendant and the informant were held within a correctional institution.  If you decide that a (declarant/ [or] witness) was not an in-custody informant, then you should evaluate his or her (statement/ [or] testimony) as you would that of any other witness.]

> <Give the first bracketed phrase if the issue of whether a witness was an in-custody informant is in dispute>

> [If you decide that a (declarant/ [or] witness) was an in-custody informant, then] (Y/)you [sic] may not convict the defendant of ___ <insert charged crime[s]> based on the   (statement/   [or]   testimony)   of   that   in-custody informant alone.    [Nor may you find a special circumstance true/ [or] use evidence in aggravation based on the (statement/ [or] testimony) of that in-custody informant alone.]

> You may use the (statement/ [or] testimony) of an in-custody informant only if:

> 1. The (statement/ [or] testimony) is supported by other evidence that you believe;

> 2. That supporting evidence is independent of the (statement/ [or] testimony);

> 3. That supporting evidence connects the defendant to the commission of the crime[s] [or to the special circumstance/ [or] to evidence in aggravation].   The supporting evidence is not sufficient if it merely shows

that the charged crime was committed [or proves the existence of a special circumstance/ [or] evidence in aggravation].

[Supporting evidence, however, may be slight.  It does not need to be enough, by itself, to prove that the defendant is guilty of the charged crime, and it does not need to support every fact (mentioned by the accomplice in the statement/ [or] about which the witness testified).  On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission.  The supporting evidence must tend to connect the defendant to the commission of the crime.]

[Do not use the (statement/ [or] testimony) of an in-custody informant to support the (statement/ [or] testimony) of another in-custody informant unless you are convinced that ___ <insert name of party calling in-custody informant as witness> has proven it is more likely than not that the in-custody informant has not communicated with another in-custody informant on the subject of the testimony.]

[A percipient witness is someone who personally perceived the matter that he or she testified about.]

<Insert the name of the in-custody informant if his or her statue [sic] is not in dispute>

[___ <insert name of witness> is an in-custody informant.]

[___ <insert name of institution> is a correctional institution.]

The prosecutor proposed that both instructions be given, with the names of Ray L., Miguel A., Rafael J., and Richard G. included in each as in-custody informants whose testimony required supporting evidence.  During the course of several instructional conferences that were held, Aguilera's attorney requested that CALCRIM No. 336 be modified to include informants who received information from another in-custody informant or inmate, not merely a defendant.  The prosecutor and other defense counsel concurred.  Rather than include the definition of an in-custody informant, the prosecutor listed the foregoing names plus that of R.C.  In addition, the trial court observed that it had reviewed the Use Notes to CALCRIM No. 301, and opined that Aguilera's name should be included in the list of names.  All counsel accepted the inclusion.

As read to the jury, CALCRIM No. 301 stated: "Except for the testimony of Ray [L.], Miguel [A.], Rafael [J.], Richard [G.], and Aaron Aguilera, which requires supporting evidence, the testimony of only one witness can prove any fact.  Before you conclude that the testimony of one witness proves a fact, you should carefully

10

review all the evidence." The modified version of CALCRIM No. 336, which was separated from CALCRIM No. 301 by several other instructions, told jurors:

> View the testimony of an in-custody informant against the defendant with caution and close scrutiny. In evaluating such testimony, you should consider the extent to which it may have been influenced by the receipt of, or expectation of any benefits. This does not mean that you may arbitrarily disregard such testimony, but you should give it the weight to which you find it to be entitled in light of all the evidence in the case.

> You may not convict the defendant of murder and shooting at an inhabited dwelling based on the testimony of that in-custody informant alone. Nor may you find a special circumstance true based on the testimony of that in-custody informant alone.

> You may use the testimony of an in-custody informant only if: Number 1, the testimony is supported by other evidence that you believe; Number 2, that supporting evidence is independent of the testimony; and, Number 3, that supporting evidence connects the defendant to the commission of the crimes or to the special circumstance.

> The supporting evidence is not sufficient if it merely shows that the charged crime was committed or proves the existence of a special circumstance.

> Supporting evidence, however, may be slight. It does not need to be enough by itself to prove that the defendant is guilty of the charged crime, and it does not need to support every fact about which the witness testified. On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission. The supporting evidence must tend to connect the defendant to the commission of the crime.

> Do not use the testimony of an in-custody informant to support the testimony of another in-custody informant unless you are convinced that the Prosecution has proven it is more likely than not that the in-custody informant has not communicated with another in-custody informant on the subject of the testimony.

> Ray [L.], Miguel [A.], Rafael [J.], Richard [G.], and [R.C.] are in-custody informants.

> A percipient witness is someone who personally perceived the matter that he or she testified about.

> The Stanislaus County Jail and the Stanislaus County Public Safety Center are correctional institutions.

B. Analysis

"The independent or de novo standard of review is applicable in assessing whether instructions correctly state the law . . . ." (*People v. Posey* (2004) 32 Cal.4th 193, 218, 8 Cal. Rptr. 3d 551, 82 P.3d 755.) Exercising our independent review, we conclude it was error to include Aguilera's name in CALCRIM No. 301.70 Under the law, a defendant is equal to all other witnesses, although he or she is superior to none. (*People v. Alvarez* (1996) 14 Cal.4th 155, 219, 58 Cal. Rptr. 2d 385, 926 P.2d 365.) Thus, a defendant's testimony should be viewed neither without caution simply because it is given by a defendant, nor with caution simply because it is given by a defendant. (*Ibid.*; *see People v. Turner* (1990) 50 Cal.3d 668, 697, 268 Cal. Rptr. 706, 789 P.2d 887 (*Turner*).)

Of course, "[a] conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense . . . . [¶] An accomplice is . . . defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.) This statutory requirement of corroboration is an exception to the substantial evidence rule, and is based on the Legislature's determination that such testimony is, by itself, insufficient as a matter of law to support a conviction, due to the reliability questions posed by accomplice testimony. (*People v. Romero and Self* (2015) 62 Cal.4th 1, 32, 191 Cal. Rptr. 3d 855, 354 P.3d 983; *see People v. Sattiewhite* (2014) 59 Cal.4th 446, 473, 174 Cal. Rptr. 3d 1, 328 P.3d 1.) When an accomplice testifies as a witness for the People, the evidence is seen as coming from a source tainted by the accomplice's participation in the crime and because he or she often is testifying in the hope of favor or expectation of immunity. (*People v. Fowler* (1987) 196 Cal.App.3d 79, 86, 241 Cal. Rptr. 571.) Where a witness testifies for a defendant, however, "the rationale underlying the cautionary instruction no longer applies" (*id.* at p. 87), because an accomplice does not usually stand to benefit from providing testimony for the defense and so his or her statements are not necessarily suspect (*People v. Guiuan* (1998) 18 Cal.4th 558, 567, 76 Cal. Rptr. 2d 239, 957 P.2d 928).

In light of the foregoing, "a trial court should instruct the jury that, to the extent a codefendant's testimony tends to incriminate a defendant, it should be viewed with care and caution and is subject to the corroboration requirement." (*People v. Avila* (2006) 38 Cal.4th 491, 562, 43 Cal. Rptr. 3d 1, 133 P.3d 1076, italics added.) Here, the modification of CALCRIM No. 301 erroneously extended the corroboration requirement to testimony given by a defendant on his own behalf that tended to incriminate neither him nor his codefendants. "There is no corroboration requirement with respect to exculpatory [or neutral] accomplice testimony." (*People v. Smith* (2017) 12 Cal.App.5th 766, 778, 218 Cal. Rptr. 3d 892; *see id.* at p. 780.)

1

2

3

4

5

6

7

The same rationale applies to the testimony of in-custody informants.  Section 1127a, subdivision (b) requires that when an in-custody informant testifies as a witness, the trial court must instruct jurors, upon request, to view the testimony of that witness "'with caution and close scrutiny,'" and to consider the extent to which it may have been influenced by the receipt or expectation of any benefits from the party calling the witness.  Section 1111.5, subdivision (a) prohibits the conviction of a defendant based on the uncorroborated testimony of an in-custody informant.  Thus, CALCRIM No. 301 should not have been modified in such a way as to suggest the testimony of any of the listed in-custody informants had to be corroborated before it was sufficient to prove any fact, regardless of whether it was inculpatory or exculpatory.

8

9

10

We conclude, however, that CALCRIM No. 336 was sufficient to cure any error in CALCRIM No. 301 with respect to the in-custody informants.  We further conclude CALCRIM No. 336 was not incorrect as given.

11

12

13

14

15

16

17

18

19

20

21

22

We recognize CALCRIM No. 336 failed to state, clearly and unambiguously, that the corroboration requirement applied only to incriminating testimony and not to any exculpatory testimony.  Although it is always preferable for an instruction to be clear and unambiguous, this is not the standard for determining error.  Rather, "'"[a] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.'" [Citation.]  If the charge as a whole is ambiguous, the question is whether there is a "'reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' [Citation.]"  (*Middleton v. McNeil* (2004) 541 U.S. 433, 437, 124 S. Ct. 1830, 158 L. Ed. 2d 701; accord, *People v. Huggins* (2006) 38 Cal.4th 175, 192, 41 Cal. Rptr. 3d 593, 131 P.3d 995.)  In making this determination, we review the allegedly erroneous instruction in the context of the evidence presented at trial, and we give the instructions a reasonable, rather than a technical, meaning.  (*People v. Martinez* (2019) 34 Cal. App. 5th 721, 728, 246 Cal. Rptr. 3d 442.)  We also consider the arguments of counsel in assessing the probable impact of the instruction on the jury (*People v. Young* (2005) 34 Cal.4th 1149, 1202, 24 Cal. Rptr. 3d 112, 105 P.3d 487), and "'we must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given'"  (*People v. Richardson* (2008) 43 Cal.4th 959, 1028, 77 Cal. Rptr. 3d 163, 183 P.3d 1146).

23

24

25

26

27

28

As given, CALCRIM No. 336 told jurors to "[v]iew the testimony of an in-custody informant *against the defendant* with caution and close scrutiny"; that they could not "*convict the defendant*" of the charged crimes based on the testimony of an in-custody informant alone; that the supporting evidence did not need to be enough "*to prove that the defendant is guilty*" of the charged crimes; and twice that the supporting evidence must "*tend to connect the defendant to the commission*" of the crimes or special circumstance. (Italics added.)  In addition, not a single attorney suggested the corroboration requirement applied to anything other than testimony from those listed in CALCRIM No. 336 that tended to inculpate

one or more defendants.  Indeed, the prosecutor referenced CALCRIM No. 336 in his opening summation and told jurors: "You're told you cannot convict based on the testimony of an in-custody informant alone.  The Prosecution must prove to you corroborating evidence from a nonaccomplice."  Each time the prosecutor discussed the instruction's corroboration requirement, he did so in terms of evidence tending to connect the defendant to the commission of the crime.

Under the circumstances, there is no reasonable likelihood jurors misinterpreted CALCRIM No. 336 to require corroboration of exculpatory or neutral testimony given by those listed as in-custody informants.  This is so even when CALCRIM No. 301 is taken into account.  Jurors were told to consider all the instructions together, and that if words or phrases were specifically defined, to follow those definitions.  Although the phrase "supporting evidence" was not actually defined, we find no reasonable likelihood jurors would have believed it meant one thing in the context of CALCRIM No. 336, but something different in the context of CALCRIM No. 301. (*See People v. Brooks* (2017) 3 Cal.5th 1, 76, 219 Cal. Rptr. 3d 331, 396 P.3d 480; *People v. Kelly* (2007) 42 Cal.4th 763, 790, 68 Cal. Rptr. 3d 531, 171 P.3d 548.)  "Indeed, were the jurors to have believed that different definitions might apply, we would expect them to seek clarification."  (*People v. Brooks*, *supra*, at p. 76.)  They did not.

To summarize, we find a single instructional error: the inclusion of Aguilera in CALCRIM No. 301 without any accompanying explanation that the instruction did not apply to nonincriminatory testimony.  Because Aguilera's name was not included in CALCRIM No. 336, we cannot say with any confidence that jurors understood his testimony needed corroboration only insofar as it was inculpatory to a codefendant.  Accordingly, we turn to an assessment of prejudice.

Defendants contend the error is one of federal constitutional magnitude.  As such, they say, the People bear the burden of proving it harmless beyond a reasonable doubt.  (*Chapman v. California* (1967) 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705; *People v. Gonzalez* (2018) 5 Cal.5th 186, 195-196, 233 Cal. Rptr. 3d 791, 418 P.3d 841.)

"A defendant has a fundamental right to testify on his own behalf. [Citations.]"  (*People v. Lancaster* (2007) 41 Cal.4th 50, 100, 58 Cal. Rptr. 3d 608, 158 P.3d 157.)  This right, which has sources in several provisions of the Constitution, "is one of the rights that 'are essential to due process of law in a fair adversary process.' [Citation.]"  (*Rock v. Arkansas* (1987) 483 U.S. 44, 51, 107 S. Ct. 2704, 97 L. Ed. 2d 37.)  Furthermore, "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' [Citations.]"  (*Crane v. Kentucky* (1986) 476 U.S. 683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636.)  In addition, "[t]he federal Constitution's due process guarantee 'protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he

14

is charged.' [Citation.]" (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 839, 231 Cal. Rptr. 3d 646, 415 P.3d 717.) "What matters, for federal constitutional purposes, is 'whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on' insufficient proof. [Citation.]" (*Id.* at p. 840.)

We do not believe the error in this case runs afoul of the foregoing principles. CALCRIM No. 301 "did not directly or indirectly address the burden of proof, and nothing in the instruction absolved the prosecution of its burden of establishing guilt beyond a reasonable doubt." (*People v. Prieto* (2003) 30 Cal.4th 226, 248, 133 Cal. Rptr. 2d 18, 66 P.3d 1123; cf. *Cool v. United States* (1972) 409 U.S. 100, 101-104, 93 S. Ct. 354, 34 L. Ed. 2d 335.) Indeed, jurors were expressly instructed that whenever the court told them that the People must prove something, it meant they must prove it beyond a reasonable doubt. Moreover, CALCRIM No. 301 neither resulted in the exclusion of defense evidence nor virtually prevented Aguilera from testifying. (Cf. *Rock v. Arkansas*, *supra*, 483 U.S. at pp. 56-57; *People v. Thornton* (2007) 41 Cal.4th 391, 452-453, 61 Cal. Rptr. 3d 461, 161 P.3d 3.)

Because the error is one of state law only, it is assessed under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, 299 P.2d 243. This standard "requires us to evaluate whether the defendant has demonstrated that it is '"reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."' [Citations.]" (*People v. Gonzalez*, *supra*, 5 Cal.5th at p. 195.) In making this determination, we examine "'"the entire cause, including the evidence" [citation] . . . .'" (*People v. Molano* (2019) 7 Cal.5th 620, 670, 249 Cal. Rptr. 3d 1, 443 P.3d 856.)

We conclude defendants have failed to establish prejudice. As we previously observed, no attorney argued Aguilera's testimony required corroboration. Aguilera's testimony was, at most, neutral with respect to his codefendants or it was an expression of opinion, as when he testified he believed Sifuentez was innocent. This testimony was bolstered by Richard G.'s testimony that he knew Sifuentez did not do it, because Sifuentez was around him a lot and would have told him. Aguilera's assertion that Ramirez was innocent of telling him to commit murder was independently supported by Rafael J.'s testimony that as far as he knew from his position within the gang, Ramirez had nothing to do with ordering the hit on E.R. Although, generally speaking, in-custody informants cannot corroborate each other (§ 1111.5, subd. (a)), by parity of reasoning with accomplice corroboration principles, they can corroborate a defendant's testimony and vice versa (*see People v. Huggins* (2015) 235 Cal. App. 4th 715, 719, 185 Cal. Rptr. 3d 672; *People v. Williams* (1954) 128 Cal. App. 2d 458, 462, 275 P.2d 513). A good deal of Aguilera's testimony regarding himself also was corroborated, most particularly his alibi for the night of the homicides. We will not assume jurors would have failed to seek out corroboration simply because the trial was lengthy.

15

1
2
3

> In light of the evidence and instructions as a whole, and the arguments of counsel, defendants have failed to demonstrate a reasonable probability any of them would have obtained a more favorable verdict had Aguilera's name been omitted from CALCRIM No. 301.  Accordingly, reversal is not warranted.

4
5

ECF No. 11-6 at 1105-13.   The California Supreme Court rejected this and petitioner's other

6

claims in a summary denial.  *Id.* at 1226.

7

To succeed on this claim, petitioner must show two things.  First, he must demonstrate

8

that the alleged error "had substantial and injurious effect or influence in determining the jury's

9

verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).  Second, he must show that the last

10

reasoned decision by the state appellate court was either: (1) contrary to established federal law or

11

an unreasonable application thereof; or (2) an unreasonable determination of the facts.

12

*Harrington v. Richter*, 562 U.S. 86, 100 (2011).  He has failed to do so here.  The state court

13

reasonably determined that the instructions, taken in their totality, did not relieve the prosecution

14

of its burden to establish guilt beyond a reasonable doubt, nor did they prevent petitioner from

15

testifying on his own behalf.  *See Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973) ("In

16

determining the effect of this instruction on the validity of respondent's conviction, we accept at

17

the outset the well-established proposition that a single instruction to a jury may not be judged in

18

artificial isolation, but must be viewed in the context of the overall charge.").  The jurors were

19

instructed that it was the prosecution's burden to prove the charges beyond a reasonable doubt;

20

petitioner was not required to prove anything.  ECF No. 11-2 at 551, 561.  The jurors were also

21

instructed that they could believe all, part, or none of any witness testimony.  *Id.* at 566.  And, as

22

the state court found, the instruction did not preclude the presentation of any defense evidence or

23

testimony from petitioner.  Thus, the state court's decision that CALCRIM No. 301 did not

24

prejudice petitioner was reasonable.  I note that, in weighing the reasonableness of the state

25

court's decision, the question is not whether this court agrees with it, but whether "fairminded

26

jurists could disagree on the correctness of the state court's decision."  *Harrington*, 562 U.S. at

27

101.  I find that, at the very least, fairminded jurists could disagree as to the state appellate court's

28

decision and, thus, it should be upheld.  Finally, to the extent any claim of state law error can be

1    understood or inferred, that claim cannot give rise to federal habeas relief.  *Estelle v. McGuire*,

2    502 U.S. 62, 67 (1991) ("We have stated many times that federal habeas corpus relief does not lie

3    for errors of state law.") (citing *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)) (internal quotation

4    marks omitted).

5                 **b.  Gang Expert Testimony**

6         In his second claim, petitioner argues that the prosecution's reliance on a gang expert's

7    hearsay testimony violated his rights under the confrontation clause.  At trial, the prosecution

8    relied on testimony from detective Martin, a gang expert.  Over petitioner's objection, Martin's

9    testimony relied on reports of gang incidents involving defendants, most of which he had only

10   secondhand knowledge of.  ECF No. 11-2 at 1690-91; ECF No. 11-4 at 1409-10.  The state

11   appellate court found that this claim did not entitle petitioner to reversal of the conviction:

> Defendants now contend their Sixth Amendment right to confrontation was violated when Martin related the contents of numerous police reports and FI cards detailing defendants' contacts with law enforcement.  The Attorney General concedes some of the evidence was improperly admitted, but contends the error was harmless under any standard.  We find no cause for reversal.

> We review de novo a claim the admission of evidence violated a defendant's Sixth Amendment confrontation right.  (*People v. Hopson* (2017) 3 Cal.5th 424, 431, 219 Cal. Rptr. 3d 717, 396 P.3d 1054.)  Under *Crawford v. Washington* (2004) 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177, "[t]he admission of testimonial statements offered against a defendant violates the Sixth Amendment confrontation clause unless the witness who made the statement is unavailable at trial and the defendant had a prior opportunity for cross-examination. [Citation.]"  (*People v. Lucas* (2014) 60 Cal.4th 153, 249, 177 Cal. Rptr. 3d 378, 333 P.3d 587, disapproved on another ground in *People v. Romero and Self, supra*, 62 Cal.4th at pp. 53-54, fn. 19.)  "Various formulations of [the] core class of 'testimonial' statements exist . . . [including] 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' [citation]."  (*Crawford, supra*, 541 U.S. at pp. 51-52.)

> At the time of trial, California Supreme Court precedent permitted the type of expert testimony at issue in the present case. (*People v. Gardeley* (1996) 14 Cal.4th 605, 617-620, 59 Cal. Rptr. 2d 356, 927 P.2d 713.)  Questions had been raised, however, concerning the continuing validity, post-Crawford, of the notion evidence forming the basis of an expert's opinion was not offered for its truth.  (*See, e.g., People v. Hill* (2011) 191 Cal.App.4th 1104, 1127-1131, 120 Cal. Rptr. 3d 251.)

Not long after defendants were sentenced, the California Supreme Court decided *People v. Sanchez* (2016) 63 Cal.4th 665, 204 Cal. Rptr. 3d 102, 374 P.3d 320 (Sanchez). In that case, the state high court observed that "[t]he hearsay rule has traditionally not barred an expert's testimony regarding his general knowledge in his field of expertise." (*Id.* at p. 676.) "By contrast, an expert has traditionally been precluded from relating case-specific facts about which the expert has no independent knowledge. Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Ibid.*) The court determined that in light of state hearsay rules and Crawford, "a court addressing the admissibility of out-of-court statements must engage in a two-step analysis. The first step is a traditional hearsay inquiry: Is the statement one made out of court; is it offered to prove the truth of the facts it asserts; and does it fall under a hearsay exception? If a hearsay statement is being offered by the prosecution in a criminal case, and the *Crawford* limitations of unavailability, as well as cross-examination or forfeiture, are not satisfied, a second analytical step is required. Admission of such a statement violates the right to confrontation if the statement is testimonial hearsay, as the high court defines that term." (*Sanchez*, *supra*, at p. 680.)

After examining United States Supreme Court and California authorities, the California Supreme Court "adopt[ed] the following rule: When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that the statements are not being admitted for their truth. If the case is one in which a prosecution expert seeks to relate testimonial hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Sanchez*, *supra*, 63 Cal.4th at p. 686, fn. omitted.)

The court cautioned that it was not calling into question "the propriety of an expert's testimony concerning background information regarding his knowledge and expertise and premises generally accepted in his field." (*Sanchez*, *supra*, 63 Cal.4th at p. 685.) "Gang experts, like all others, can rely on background information accepted in their field of expertise under the traditional latitude given by the Evidence Code. They can rely on information within their personal knowledge, and they can give an opinion based on a hypothetical including case-specific facts that are properly proven. They may also rely on nontestimonial hearsay properly admitted under a statutory hearsay exception. What they cannot do is present, as facts, the content of testimonial hearsay statements." (*Ibid.*) The court clarified: "Any expert may still rely on hearsay in forming an opinion, and may tell the jury in general terms that he did so. Because the jury must independently evaluate the probative value of an expert's testimony, Evidence Code section 802 properly allows an expert to relate generally the kind and source of the 'matter' upon which his opinion rests. . . . There is a distinction to be made between allowing an expert to describe the type or source of the matter relied upon as opposed to presenting, as fact, case-specific hearsay that

does not otherwise fall under a statutory exception. [¶] What an expert cannot do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Id.* at pp. 685-686.)  This is so even though "merely telling the jury the expert relied on additional kinds of information that the expert only generally describes may do less to bolster the weight of the opinion." (*Id.* at p. 686.)

There can be no doubt Martin conveyed evidence to the jury that was improperly admitted under *Sanchez*, either because it was hearsay that fell within no state evidentiary hearsay exception, or because it was testimonial hearsay.  (*See*, *e.g.*, *Sanchez*, *supra*, 63 Cal.4th at pp. 694, 697; *People v. Iraheta* (2017) 14 Cal.App.5th 1228, 1248-1250, 222 Cal. Rptr. 3d 706.)  *Crawford* error is assessed under *Chapman*'s beyond a reasonable doubt standard.  (*People v. Rutterschmidt* (2012) 55 Cal.4th 650, 661, 147 Cal. Rptr. 3d 518, 286 P.3d 435; *see*, *e.g.*, *Sanchez*, *supra*, 63 Cal.4th at p. 699.)  State law error in the admission of hearsay is assessed under *Watson*'s reasonable probability standard.  (*People v. Duarte* (2000) 24 Cal.4th 603, 619, 101 Cal. Rptr. 2d 701, 12 P.3d 1110.)

In the present case, a significant amount of Martin's testimony did not run afoul of *Sanchez*, with respect either to state hearsay rules or to *Crawford*.  (*See*, *e.g.*, *People v. Garton* (2018) 4 Cal.5th 485, 506, 229 Cal. Rptr. 3d 624, 412 P.3d 315; *People v. Meraz* (2018) 30 Cal. App. 5th 768, 781-782, 242 Cal. Rptr. 3d 1, review granted Mar. 27, 2019, S253629; *People v. Iraheta*, *supra*, 14 Cal.App.5th at p. 1248; *People v. Vega-Robles* (2017) 9 Cal.App.5th 382, 412-413, 224 Cal. Rptr. 3d 19; *People v. Valadez* (2013) 220 Cal.App.4th 16, 35-36, 162 Cal. Rptr. 3d 722; cf. *People v. Martinez* (2018) 19 Cal.App.5th 853, 859, 228 Cal. Rptr. 3d 271.)  In addition, he was permitted to rely on hearsay information in forming his opinions, and could have told the jury in general terms that he did so.  (*People v. Jones* (2017) 3 Cal.5th 583, 603, fn. 4, 220 Cal. Rptr. 3d 618, 398 P.3d 529; *Sanchez*, *supra*, 63 Cal.4th at p. 685.)  His opinions would not have changed had he known he could not recite case-specific hearsay or testimonial hearsay.  Given the other, properly admitted evidence, the value of those opinions would not have been significantly weakened nor would corroboration for the in-custody informants have been lacking.

In light of all the properly admitted evidence, we conclude the trial court's error in admitting those portions of Martin's testimony consisting of case-specific hearsay and case-specific testimonial hearsay was harmless under either the *Watson* or the *Chapman* standard.  (*See People v. Jablonski* (2006) 37 Cal.4th 774, 821, 38 Cal. Rptr. 3d 98, 126 P.3d 938.)  Defendants are not entitled to reversal with respect either to the gang enhancements or the charged offenses, despite the fact the prosecutor relied heavily on the gang evidence in his theory of the case.

1  ECF No. 11-6 at 1114-16.  Again, the California Supreme Court rejected this claim in a summary

2  denial.  *Id.* at 1226.

3        This claim fails because there is no clearly established federal law holding that a gang

4  expert's reliance on hearsay testimony is violative of the Confrontation Clause.  *See Holley v.*

5  *Yarborough*, 568 F.3d 1091, 1098 (9th Cir. 2009) ("When there is no clearly established federal

6  law on an issue, a state court cannot be said to have unreasonably applied the law as to that

7  issue.").  "The Supreme Court has not clearly established that the admission of out-of-court

8  statements relied on by an expert violates the Confrontation Clause."  *Hill v. Virga*, 588 F. App'x

9  723, 724 (9th Cir. 2014); *see also Lopez v. Davey*, No. 13-cv-4879-THE, 2015 WL 4776434, *18,

10 2015 U.S. Dist. LEXIS 107553, *54, (N.D. Cal. 2015) ("There is no clearly established Supreme

11 Court authority that admission of hearsay statements relied on by an expert violates the

12 Confrontation Clause.").

13                      c.  **Cumulative Error**

14       Petitioner's last claim is that the cumulative impact of the foregoing errors violated his

15 rights.  The state appellate court rejected this claim as well:

16            Defendants contend the cumulative impact of the errors deprived
             them of their rights to due process and a fair trial.  The only errors
17            we have found involved a single jury instruction and admission of
             some of the gang expert's testimony.  Neither increased the impact
18            of the other, and we do not find reversible error by considering their
             cumulative impact. (*See People v. Zaragoza* (2016) 1 Cal.5th 21, 60,
19            204 Cal. Rptr. 3d 131, 374 P.3d 344; *People v. Chism* (2014) 58
             Cal.4th 1266, 1309, 171 Cal. Rptr. 3d 347, 324 P.3d 183.)
20
21 ECF No. 11-6 at 1116-17.  The California Supreme Court issued a summary denial.  *Id.* at 1226.

22       Petitioner's individual claims of error are non-meritorious, and so his claim for cumulative

23 error fails as well.  *See United States v. Franklin*, 321 F.3d 1231, 1241 n.4 (9th Cir. 2003)

24 ("Because no individual errors underlying [Franklin's] convictions have been demonstrated, no

25 cumulative error exists.").

26       Based on the foregoing, it is RECOMMENDED that the petition, ECF No. 1, be

27 DENIED.

28
                                                    20

1       These findings and recommendations are submitted to the United States District Judge

2 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days of

3 service of these findings and recommendations, any party may file written objections with the

4 court and serve a copy on all parties. Any such document should be captioned "Objections to

5 Magistrate Judge's Findings and Recommendations," and any response shall be served and filed

6 within fourteen days of service of the objections. The parties are advised that failure to file

7 objections within the specified time may waive the right to appeal the District Court's order. *See*

8 *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.

9 1991).

10

11 IT IS SO ORDERED.

12

13 Dated:   April 8, 2025

14                                         JEREMY D. PETERSON

                                        UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28